**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gordon M. KENNGOTT,
Defendant–Appellant.**

**No. 86–2246.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 24, 1987.

Decided Dec. 30, 1987.

Thomas E. Brown, Gimbel, Reilly, Guerin & Brown, Marna M. Tess–Mattner, Milwaukee, Wis., for defendant-appellant.

Gerald D. Fines, U.S. Atty., K. Tate Chambers, Mark D. Stuaan, Asst. U.S. Attys., Peoria, Ill., for plaintiff-appellee.

Before WOOD, POSNER and MANION, Circuit Judges.

MANION, Circuit Judge.

Appellant, Gordon M. Kenngott, moved in district court to have his sentence vacated under 28 U.S.C. § 2255. The district court denied his motion. We affirm.

## I.

This is Gordon Kenngott's second attempt to have his conviction set aside. Kenngott was indicted and tried on two counts of interstate transportation of fraudulently taken money in violation of 18 U.S.C. § 2314, two counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of conspiracy to violate federal laws in violation of 18 U.S.C. § 371. According to the indictment, Kenngott conspired to violate a provision of 18 U.S.C. § 2314 that prohibits causing a person to travel in interstate commerce in the execution or concealment of a scheme to defraud that person. The jury convicted Kenngott and a co-defendant, Ivan Brown, on all five counts. This circuit affirmed Kenngott's conviction on direct appeal. *United States v. Brown*, 739 F.2d 1136 (7th Cir.), *cert. denied, Kenngott v. United States*, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984).

Kenngott next sought to have his conviction set aside by filing a motion in district court to vacate his sentence under 28 U.S.C. § 2255 (§ 2255). Kenngott's § 2255 motion claimed that the indictment was fatally defective because the statutes under which he was charged did not prohibit his activities.

The five-count indictment against Kenngott charged him with participating in a phony loan brokerage operation. The indictment detailed two schemes in which Kenngott and his co-conspirators defrauded loan seekers. The first scheme involved two Kankakee County, Illinois businessmen who sought an $18 million loan. Kenngott and Ivan Brown told the businessmen that they had to pay $20,000 for the purchase of an "I.C.C. 290 bond" before the loan could be processed. There is no such thing as an "I.C.C. 290 bond." An "I.C.C. 290" is simply a pamphlet published by the International Chamber of Commerce that establishes certain standard rules and terminology to help facilitate international trade. *See Brown*, 739 F.2d at 1139–40. The Kankakee County businessmen were told that the "I.C.C. 290 bond" would guarantee the principal of their loans and that the loan would be funded within 15 to 30 days after the "I.C.C. 290 bond" was purchased. On November 6, 1979, the businessmen wired $20,000 from Illinois to Brown's company in Wisconsin. When the loan was not funded Kenngott and Brown told the businessmen that problems had arisen because Iranians were the lending source for the loan and President Carter had frozen all Iranian assets in the United States. Kenngott and Brown told the businessmen that the "I.C. C. 290 bond" would be applied toward a loan from another source. The loan was never funded.

The other fraudulent scheme involved a Seymour, Illinois businessman who was assisting other businessmen to borrow over $800 million. Kenngott and Brown told the Seymour businessman that $190,000 would be needed to purchase an "I.C.C. 290 bond" to guarantee funding for the loan. The businessman was also told that funding would be available "within days" after the money was received. On December 14, 1979, the businessman wired $190,000 from Illinois to Brown's company in Wisconsin. When funding was not forthcoming, Kenngott responded to the businessman's queries by stating that funding would be received through the "World Islamic Committee" and that bank verification was expected by February 20, 1980. On March 25, 1980, Ivan Brown told the businessman that Brown's company had assigned a London Irish Bank Letter of Guarantee developed for a $1.161 billion loan to the businessmen. As with the scheme involving the Kankakee County businessmen, funding for the loan was never received.

Kenngott's § 2255 motion claimed that the indictment was fatally defective because it did not allege that he engaged in activities that violate 18 U.S.C. § 2314, one

of the statutes under which he was charged.[1] Section 2314 provides:

Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any traveler's check bearing a forged countersignature; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce, any tool, implement, or thing used or fitted to be used in falsely making, forging, altering, or counterfeiting any security or tax stamps, or any part thereof—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country.

At this stage of the proceedings there is no argument concerning whether Kenngott's conduct fell within the first two paragraphs of § 2314. The indictment alleges that fraudulently taken money was transported in interstate commerce, *see generally Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 357, 362, 98 L.Ed. 435 (1954) ("[t]o constitute a violation of [the first paragraph of § 2314], it is not necessary to show that [the defendants] actually ... transported anything themselves; it is sufficient if they caused it to be done"); *United States v. Wright*, 791 F.2d 133, 135–37 (10th Cir.1986) (electronic transfer of funds constitutes transportation of money under § 2314), and that a person was induced to travel in interstate commerce in the execution and concealment of the conspirators' scheme to defraud that person of money. Instead, Kenngott claims that his activities fell within the exclusionary provision of § 2314 because his activities involved "spurious representation[s] ... of an obligation, bond, certificate ... [or] promise to pay ... issued by ... a bank or corporation of any foreign country."

The district court denied Kenngott's motion, reasoning that the exclusionary provision of § 2314 covers only the property transported in interstate commerce, not the "bait" that causes the property to be transported. Under the district court's reasoning, it did not matter whether "I.C.C. 290 bonds" are "spurious representations" of an obligation issued by a bank of a foreign country. The district court stated in relevant part:

---

1. Kenngott claims that the failure to charge him with a § 2314 violation calls for the dismissal of the conspiracy and wire fraud counts as well. Kenngott argues that the conspiracy count fails because he was charged with conspiring to violate a statute, § 2314, that did not prohibit his activities. *See United States v. Galardi*, 476 F.2d 1072, 1079 (9th Cir.), *cert. denied*, 414 U.S. 839 and 856, 94 S.Ct. 90 and 160, 38 L.Ed.2d 75 and 106 (1973). Kenngott gave no discernible rea-son below (or on appeal), however, as to why the wire fraud count should fail if the § 2314 counts should be found deficient. *See United States v. Wright*, 791 F.2d 133, 135–37 (10th Cir.1986) (upholding conviction for both wire fraud and interstate transportation of fraudulently taken money). Since we hold that Kenngott's conduct *did* violate § 2314, we need not address this issue.

[T]he government did not charge Kenngott with transporting the letters of commitment from the London Irish Bank across state lines. Rather, the government charged Kenngott with causing investors to wire money across state lines as part of his scheme to defraud. It was the investors' money, wired across state lines, which was the crux of the charges under section 2314. The exception contained in section 2314 does not apply to Kenngott's case.

(Order, p. 2)

## II.

 Kenngott did not argue on direct appeal that his conduct fell within the exclusionary provision of § 2314 and he gives no reason for his failure to do so. Normally, a person is barred from raising an issue for the first time in a § 2255 proceeding absent a showing of cause for and prejudice from the failure to raise the issue on direct appeal. *See DeGrave v. United States*, 820 F.2d 870, 871–72 (7th Cir.1987). A showing of "cause and prejudice," however, is not jurisdictional; the government may waive the issue. *United States v. Angelos*, 763 F.2d 859, 861 (7th Cir.1985). Here, the government did not raise the issue of "cause and prejudice" until oral argument. Its failure to brief the issue waives the issue before us. *See United States v. Hornick*, 815 F.2d 1156, 1159 (7th Cir.1987) (arguments not raised in briefs deemed waived). Accordingly, we may consider the merits without deciding whether Kenngott can show cause for and prejudice from his failure to raise the issue on direct appeal.

## A.

On the merits, Kenngott maintains that the district court erroneously determined that the exclusionary provision did not apply to his activities. He argues that since there is no such thing as an "I.C.C. 290 bond", his fraudulent representations concerning "I.C.C. 290 bonds" were "spurious representations." Because the indictment alleges only that Kenngott fraudulently stated that he would purchase the "bonds",

Kenngott implicitly premises his argument on the contention that the term "spurious representation" applies to false statements of fact. He then reasons that:

These 'spurious representations' were regarding bonds or promises to pay by a bank of a foreign country. The only bond identified in the indictment was a letter of guarantee issued by the London Irish Bank. Furthermore, the I.C.C. 290 is indisputably part of the International Chamber of Commerce guidelines for international trade, making the references to 'I.C.C. 290 bonds' references to foreign bonds or promises to pay. Because the 'spurious representations' were of foreign banks' promises to pay, the fraudulent scheme as alleged in the indictment is expressly excluded from 18 U.S.C. § 2314.

(Appellant's Br., pp. 7–8).

Kenngott contends that it is irrelevant that the government charged him with transporting money rather than a "spurious representation" in interstate commerce. The essence of Kenngott's argument is that § 2314 is primarily directed at fraudulent activities, not transportation. Regardless of what is transported in interstate commerce, Kenngott maintains that the exclusionary provision applies if excluded items form an integral part of the fraudulent scheme.

Thus, Kenngott's appeal has two basic premises. These are: (1) that his activities involved "spurious representation[s] ... of an obligation [or] bond ... issued ... by a bank ... of [a] foreign country"; *and* (2) that the exclusionary provision applies to any activities involving "spurious representations" of a bond issued by a bank of a foreign country and not simply to the actual transportation of such "spurious representations." Kenngott's appeal fails on both points.

### 1. *"Spurious Representation" Of An Obligation Or Bond.*

 Congress does not define the term "spurious representation" in either § 2314 or 18 U.S.C. § 2311 (which defines some terms used in § 2314). In different con-

texts, the dictionary definition of the terms "spurious" and "representation" could apply either to documents that are fraudulently passed off as genuine or to fraudulent statements of fact.[2] Kenngott argues that the term "spurious representation" in the exclusionary provision applies to fraudulent statements of fact. When placed within the context of § 2314, however, the term "spurious representation" is limited to documents that are fraudulently passed off as genuine.

Congress enacted § 2314 to aid the States in apprehending criminals who commit state law crimes but who use the channels of interstate commerce to avoid detection and punishment. *See McElroy v. United States*, 455 U.S. 642, 654, 102 S.Ct. 1332, 1339, 71 L.Ed.2d 522 (1982). Transportation in interstate or foreign commerce is an essential element of every violation of § 2314. Given the essential element of transportation, the statute implicitly applies only to those things that are normally thought capable of being transported, that is, tangible objects. *See United States v. Anderson*, 532 F.2d 1218, 1221 (9th Cir.) (§ 2314 "refer[s] only to tangible items which are capable of being touched and are able to be perceived as materially existing, especially by the senses of sight or touch."), *cert. denied*, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976). While cases under § 2314 have held that the fraudulently taken property need not be transported in the form in which it is stolen, *see United States v. Morgan*, 805 F.2d 1372, 1377–78 (9th Cir.1986) (transportation of Kruegerrands purchased from fraudulently obtained funds), *cert. denied*, —— U.S. ——, 107 S.Ct. 1612, 94 L.Ed.2d 797 (1987); *United States v. Gilboe*, 684 F.2d 235, 238 (2d Cir.1982) (electronic transfer of fraudulently taken funds), *cert. denied*, 459 U.S. 1201, 83 S.Ct. 1185, 75 L.Ed.2d 432 (1983), and that the stolen property can derive much of its value from an intangible source, *see United States v. Greenwald*, 479 F.2d 320, 322 (6th Cir.) (documents containing secret formulas), *cert. denied*, 414 U.S. 854, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973), we are not aware of any case applying any portion of § 2314 to something completely intangible. Thus, construing the term "spurious representation" to apply to documents fraudulently passed off as genuine, that is, as synonymous with the term "counterfeit document," meshes with the statutory scheme. Kenngott's broader interpretation, which could apply to any verbal statement, does not.

Familiar principles of statutory interpretation support treating the term "spurious representation" as synonymous with the term "counterfeit document." For example, when the same term is used more than once in a statute it should ordinarily be given the same meaning. *See Barnson v.*

2. "Spurious" is defined as "**2a:** outwardly similar or corresponding to something without having its genuine qualities: FALSE, COUNTERFEIT ... **3a:** of falsified or erroneously attributed origin or authorship: FORGED, INAUTHENTIC ... **b:** of a deceitful or fictitious nature or quality: FRAUDULENT ... **4:** marked by spuriousness or falseness...." Webster's Third New International Dictionary (Webster's) 2212 (1981).

"Representation" is defined as "**1:** one that represents or is represented: as **a:** a likeness, picture, model, or other reproduction ... **b(1):** a statement or account [especially] made to convey a particular view or impression of something with the intention of influencing opinion or action...." Webster's 1926.

When used in the context of documents fraudulently passed off as genuine the term "spurious" is synonymous with the term "counterfeit." "Counterfeit" is defined as "**1a:** SPURIOUS: not genuine or authentic; [especially]: not composed by the author indicated or under the circumstances ascribed ... **b:** made in fraudulent imitation: produced with intent to deceive: FORGED...." Webster's 519. The difference between "spurious" and "counterfeit" is that the term "spurious" does not "necessarily" imply intent to deceive. *Id.*

The relationship between the terms "spurious" and "counterfeit" is further described in the definition of a "spurious bank-bill":

A bill which may be a legitimate impression from the genuine plate, but it must have the signatures of persons not the officers of the bank whence it purports to have issued, or else the names of fictitious persons. It may also be an illegitimate impression from a genuine plate, or an impression from a counterfeit plate, but it must have such signatures or names as indicated. A bill, therefore, may be both counterfeit and forged, or both counterfeit and spurious, but it cannot be both forged and spurious.

Blacks Law Dictionary 1258 (5th ed. 1979).

*United States,* 816 F.2d 549, 554 (10th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). The term "security" in § 2314 is defined in § 2311 as "any note, stock certificate, bond, ... letter of credit ... or any forged, counterfeited, or *spurious representation* of any of the foregoing." (Emphasis added.) In *Anderson,* the Ninth Circuit held that the term "security" applied only to tangible physical objects and defined the term "spurious" as synonymous with the term "counterfeit." *See* 532 F.2d at 1221, 1223–24 (defining "spurious" as "outwardly similar or corresponding to something, without having its genuine qualities"). We see no reason why the term "spurious representation" should be defined differently in § 2314's exclusionary provision.

The principle that words grouped together in a statute should be given a related meaning, *see Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985), also supports the conclusion that the term "spurious representation" does not refer to fraudulent statements. In the exclusionary provision, the term "spurious" is immediately preceded by the terms "falsely made," "forged," "altered," and "counterfeited." All these terms modify the term "representation" and they all refer to actual documents that are in some way fraudulently passed off as genuine. The association of "spurious representation" with such terms as "forged representations" and "counterfeited representations" strongly suggests that Congress intended "spurious representation" to have a related meaning.

An examination of § 2314's legislative history erases any doubts concerning what Congress intended the term "spurious representation" to mean. The exclusionary provision of § 2314 was part of a 1939 amendment to the National Stolen Property Act of 1934. The National Stolen Property Act of 1934 prohibited the interstate transportation of, among other things, goods, securities and money with knowledge that the items were stolen or taken by fraud. *See* 48 Stat. 794–95 (1934). In 1939, Congress amended the Act to also prohibit the interstate transportation of counterfeit securities. *See* 53 Stat. 1178 (1939). At that time, Congress added the exclusionary provision because federal statutes already prohibited the possession and delivery of counterfeit obligations of the United States Government and foreign governments. As the Report of the House Committee on the Judiciary explained:

> [T]he Stolen Property Act makes it a Federal criminal offense knowingly to transport in interstate or foreign commerce stolen property, securities, or money of the value of $5,000 or more. This section of the law is amended by section 1 of the reported bill to include such transportation of property, securities, or money of the same minimum value which have been feloneously converted, and also to include transportation of falsely-made, forged, altered, or counterfeited securities of the apparent or purported value of $5,000 or more. *Counterfeited securities of the United States and foreign governments are exempted by a proviso because they are dealt with adequately by other provisions of existing law.*

H.R.Rep. No. 422, 76th Cong., 1st Sess. 1 (1939) (emphasis added). *See also* Letter from the Attorney General to Speaker of the House Bankhead dated Dec. 29, 1938 (incorporated in H.R.Rep. No. 422, 76 Cong. 1st Sess. 3 (1939)) ("It is also desirable to include the transportation of counterfeit securities within the prohibitions of the statute. It need not, however, embrace counterfeit Government obligations or counterfeit foreign obligations, as the statutes relating to counterfeiting penalize their possession."). In turn, the relevant counterfeiting statute covering obligations issued by a bank of a foreign government (now codified at 18 U.S.C. § 480) prohibited the possession or delivery of "false, forged or counterfeit" obligations.[3] It did not pro-

---

3. 18 U.S.C. § 480 provides:
 Whoever ... knowingly and with intent to defraud, possesses or delivers any false,
 forged, or counterfeit bond, certificate, obligation, security, treasury note, bill, promise to pay, bank note, or bill issued by a bank or

hibit making fraudulent statements about or fraudulent promises to purchase such obligations. In light of this legislative history it is evident that the term "spurious representation" does not apply to mere fraudulent promises.[4]

Moreover, the legislative history also shows that Kenngott's interpretation of the statute would place a large, unintended gap in the statutory scheme—a gap Kenngott obviously hopes to slide through. If the exclusionary provision was construed, as Kenngott urges, to apply to a scheme involving the interstate transportation of money induced by false promises to purchase foreign government obligations, neither § 2314 nor the relevant federal counterfeiting statute, § 480, would cover such a scheme. These schemes would not violate § 480 because there is no possession or delivery of a counterfeit foreign government obligation. Kenngott's interpretation of the exclusionary provision would then take the schemes outside the scope of § 2314. Congress neither intended nor created such a gap in the statutory scheme. Congress intended only that the exclusionary provision cover those activities that would violate both § 2314 and the federal counterfeiting statutes. *Cf. United States v. Noe,* 634 F.2d 860, 861–62 & n. 2 (5th Cir.), *cert. denied,* 454 U.S. 876, 102 S.Ct. 355, 70 L.Ed.2d 186 (1981). Since Kenngott's activities did not violate the federal counterfeiting statutes, § 2314's exclusionary provision did not cover his activities. *See id.*

■ In short, the indictment properly charged Kenngott with violating § 2314 by causing persons to transport money in interstate commerce by fraudulently promising to purchase bonds for those persons. Such promises do not fall within the meaning of the term "spurious representations" as used in § 2314's exclusionary provision.

As used in the exclusionary provision, the term "spurious representation" applies only to documents that are fraudulently passed off as genuine.

2. *Transportation of the Excluded Items.*

■ Although Kenngott's petition fails because his activities did not involve a "spurious representation," we need not rest our decision solely on that ground. Even assuming that his activities involved "spurious representations", the crimes Kenngott was charged with did not fall within the exclusionary provision. Kenngott was not charged with transporting "spurious representations." Rather, he was charged with causing fraudulently taken money to be transported in interstate commerce. Nonetheless, because the exclusionary provision does not expressly state that the excluded items (e.g., counterfeited or spurious representations of an obligation or bond issued by foreign government) be transported in interstate commerce, Kenngott reads the exclusionary provision to exempt all criminal activities *involving* the excluded items (as opposed to exempting only the transportation of the excluded items). The district court, however, correctly construed the exclusionary provision to apply only to the items actually *transported* in interstate commerce.

A fundamental principal of statutory construction is that sections of a statute should be construed in the context of the entire statute. Given that interstate or foreign transportation is an essential element of every § 2314 violation and that § 2314's various provisions differ only with respect to what is being transported, the most logical interpretation of the exclusionary provision is that it exempts only the

corporation of any foreign country, shall be fined not more than $1,000 or imprisoned not more than one (1) year, or both.

**4.** Because we conclude that Kenngott's activities did not involve "spurious representations" we need not address whether, within the context of the indictment, the term "I.C.C.–290 bond" is merely a shorthand term for a London Irish

Bank letter of credit or whether the London Irish Bank constitutes a "bank of any foreign country." See *United States v. Noe,* 634 F.2d 860, 861–62 (5th Cir.), *cert. denied,* 454 U.S. 876, 102 S.Ct. 355, 70 L.Ed.2d 186 (1981) (exclusionary provision applies only to obligations of foreign government banks, not to obligations of foreign private banks).

*transportation* of the excluded items from the coverage of § 2314. This is particularly so in light of the fact that Congress drafted the exclusionary provision in terms of the specific items excluded, not in terms of "schemes" or "activities" involving the items. Moreover, Kenngott's desired interpretation of the exclusionary provision that would exempt any fraudulent activity *involving* the excluded items would destroy any symmetry between the exclusionary provision and the rest of the statute. His interpretation of the exclusionary provision would exclude criminal activities that are not prohibited by the statute.

The legislative history also warrants construing the exclusionary provision to apply only to the items transported in interstate commerce. As discussed earlier, the exclusionary provision was added to the statute in 1939 to avoid overlap between the federal counterfeiting statutes and the newly-enacted provision of § 2314 prohibiting the transportation of counterfeit securities. Both before and after the counterfeiting and exclusionary provisions were added to § 2314, however, there was a need to protect victims of fraud by banning the interstate transportation of *money* taken by fraud—regardless of what lures or representations induced the transportation. Nothing in the legislative history even hints that the exclusionary provision was ever intended to "decriminalize" such schemes.

■ Thus, even if the indictment could be read to involve a "spurious representation" of an obligation issued by a bank of a foreign government, the indictment is not defective. The indictment alleges that fraudulently taken money, not a "spurious representation", was transported in interstate commerce. Accordingly, for this additional reason, § 2314's exclusionary provision has no applicability to Kenngott's conduct.

### B.

■ As a fallback position, Kenngott contends that we should accept his interpretation of the exclusionary provision in light of the principle that ambiguities in criminal statutes should be construed in favor of leniency. *See Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). The principle of lenient construction is founded upon the policies that legislatures should give fair warning of what conduct is prohibited and to ensure that legislatures, not judges, define criminal activity. *See United States v. Bass*, 404 U.S. 336, 347–48, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971). The principle of leniency does not, however, require the judiciary to abdicate its responsibilities and blindly apply the most lenient possible construction to a statute. *See United States v. Turley*, 352 U.S. 407, 413, 77 S.Ct. 397, 400, 1 L.Ed.2d 430 (1957). It is appropriate for the courts, consistent with the policies of fair warning and the avoidance of judicial usurpation of legislative functions, "to consider the purpose of the act under review and to ascribe a meaning to its words consistent with the context in which they appear." *United States v. Spiedel*, 562 F.2d 1129, 1131 (8th Cir.1977), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 505 (1978); *see also Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 1271, 39 L.Ed.2d 782 (1974) (statutes " 'ought not to be construed so strictly as to defeat the obvious intention of the legislature' ") (quoting *American Fur Co. v. United States*, 27 U.S. (2 Pet.) 358, 367, 7 L.Ed. 450 (1829)).

Here, the principle of lenient construction does not warrant Kenngott's construction of the statute. Kenngott cannot complain he lacked fair warning. Kenngott engaged in obvious criminal fraud and § 2314 plainly prohibits the interstate transportation of money taken by fraud. He cannot avoid responsibility for his conduct by strained arguments concerning the meaning and scope of the exclusionary provision. While we seriously doubt that Kenngott consulted § 2314 before defrauding the businessmen, a common-sense reading of the statute as well as the legislative history would have told him that the interstate transportation of fraudulently taken money violated the law and that the exclusionary provision had no application to his

conduct. Given the broad prohibitions in § 2314 and the obvious criminality of his conduct, he could not have expected Congress to have granted him a generous loophole through which he could separate the victims from their money with impunity.

In sum, § 2314's exclusionary provision does not exempt Kenngott's conduct. The exclusionary provision applies only to the items actually transported in interstate commerce and it does not apply to the transportation of money induced by fraudulent promises to obtain bonds issued by a bank of a foreign country. The judgment of the district court is

AFFIRMED.